# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

   Plaintiff,

vs.

THOMAS EDWARD CLUTTS, JR.,

   Defendant.

No. 18-CR-70-CJW-MAR

**MEMORANDUM OPINION AND ORDER**

## I. INTRODUCTION

This matter is before the Court on defendant's Amended Motion for Compassionate Release filed on October 9, 2020. (Doc. 99). On October 16, 2020, the government timely filed a resistance. (Doc. 102). Defendant did not timely file a reply. For the following reasons, the Court **denies** defendant's motion.

## II. RELEVANT BACKGROUND

From as late as January 2018 through May 23, 2018, defendant was a member of a conspiracy to distribute at least 500 grams or more of a mixture or substance containing methamphetamine or 50 grams or more of actual (pure) methamphetamine. (Doc. 64, at 5). Defendant, a California resident, supplied methamphetamine to J.T., an Iowa resident, for redistribution in Iowa. (*Id.*). On January 27, 2018, police conducted a traffic stop on a vehicle driven by defendant in Linn County, Iowa. (*Id.*, at 6). Officers recovered syringes (one of which contained methamphetamine), baggies, a scale, a glass bong, a small bag of methamphetamine, and a container of THC wax from the vehicle. (*Id.*). On February 1, 2018, officers again stopped defendant's vehicle in Cedar Rapids, Iowa, and recovered a loaded handgun. (*Id.*). "[D]efendant possessed this firearm in

furtherance of the conspiracy to distribute methamphetamine" and, when officers were approaching the vehicle, defendant reportedly tried to force one of the passengers to take possession of the firearm. (*Id.*). On at least two occasions in April 2018, J.T. travelled to California and purchased a total of at least seven pounds of methamphetamine from defendant. (*Id.*). Methamphetamine was also shipped through the mail to Iowa at defendant's direction as part of the conspiracy. (*Id.*, at 6, 7). On April 24, 2018, officers stopped defendant's vehicle in Bellflower, California and recovered baggies of heroin, methamphetamine, and cocaine. (*Id.*, at 6).

On May 1, 2018, J.T. was arrested and found in possession of methamphetamine, $9,520 in cash, and drug paraphernalia. (*Id.*, at 7). In a recorded jailhouse phone call between J.T. and his 17-year-old son S.T., the two discussed defendant wanting S.T. "to take over for [J.T.] in the drug trafficking organization." (*Id.*). The two also discussed the need to halt shipments of methamphetamine from defendant given J.T.'s incarceration. (*Id.*). On May 4, 2018, officers attempted to stop defendant's vehicle in California, but, as the vehicle slowed down, defendant "jumped out and dropped a stack of cash onto the ground." (*Id.*, at 8). Defendant stopped when ordered by police. (*Id.*). In the trunk of the car, officers recovered baggies of marijuana, heroin, cocaine, and methamphetamine. (*Id.*). When interviewed about the conspiracy, defendant described himself as a middleman who merely set up transactions in exchange for "gas money or small amounts of narcotics." (*Id.*).

On July 26, 2018, a grand jury issued an Indictment charging defendant with one count of conspiracy to distribute methamphetamine in violation of Title 21, United States Code, Section 846. (Doc. 2). That same day, defendant pled not guilty and was detained. (Doc. 4). On November 9, 2018, a grand jury issued a Superseding Indictment additionally charging defendant with possession of firearms during and in relation to a drug trafficking crime in violation of Title 18, United States Code, Section 924(c). (Doc.

26). On November 19, 2018, defendant again pled not guilty. (Doc. 30). On January 4, 2019, defendant changed his plea to guilty on the conspiracy charge. (Doc. 48). That same day, the Court accepted defendant's plea. (Doc. 52).

On July 10, 2019, the United States Probation Office filed defendant's final presentence investigation report. (Doc. 64). Defendant was, at that time, 45 years old and residing in California. (*Id.*, at 2). Defendant was primarily raised by his father. (*Id.*, at 20). Although defendant had occasional contact with his mother growing up, he reported that they "only got high together." (*Id.*). Defendant's mother died of a drug overdose in 1997. (*Id.*). Defendant had three adult children from a prior relationship and a teenage daughter with his current, longtime girlfriend/common law wife. (*Id.*, at 21); (Doc. 91, at 2). Defendant's adult children were at some point adopted by another family. (Doc. 64, at 21). Defendant earned his GED and took some college classes while incarcerated. (*Id.*, at 23). Although defendant claimed he performed various manual labor jobs through a temp agency and was a self-employed tattoo artist (earning $3,000 a month), he could not list any formal employment over the last ten years. (*Id.*). Defendant's Social Security records indicate he had no reported income over the last ten years aside from $1,722 in 2010. (*Id.*).

Defendant reported no major health issues at the time of sentencing. It was noted only that he had a prior knee surgery, a prior stomach surgery after being stabbed, poor vision, and was "monitoring for diabetes." (*Id.*, at 21). In May 1992, defendant was treated for depression after a suicide attempt that he reported was to "get attention from his father." (*Id.*, at 22). Although he complied with treatment, he was noted as "'somewhat defiant and oppositional' towards staff." (*Id.*). Defendant was diagnosed with adjustment disorder, emotional disturbances, polysubstance abuse disorder, and antisocial personality disorder. (*Id.*). Defendant was discharged from treatment that same month. (*Id.*). Defendant reported that he was prescribed medicine for attention

3

deficit hyperactivity disorder in 2012. (*Id.*). Defendant reported that he drank two beers per week from ages 10 to 44, smoked marijuana daily from ages 6 to 16 as given to him by his mother, and smoked methamphetamine "as often as possible" from ages 14 to 44. (*Id.*). Defendant often used cocaine and, near the time of the instant offense, used it two to three times a week. (*Id.*). Defendant also reported that he huffed gasoline as a child. (*Id.*). Although defendant was placed in drug treatment in late 2012, he did not complete the program. (*Id.*).

Defendant's criminal history was significant. He was convicted of grand theft of a vehicle, taking a vehicle without the owner's consent four times, hit and run causing property damage twice, carrying a loaded firearm in a public place, felon or addict in possession of a firearm twice, reckless evasion or flight twice, grand theft, driving on a suspended license, possession of a controlled substance four times (once while armed), robbery, possession with intent to distribute a controlled substance, receipt of stolen property twice, obstructing a public officer, and evading an officer. (*Id.*, at 13–17). Defendant's criminal history spanned his entire adult life. Of his 15 convictions, 11 occurred while he was already on probation or parole, as did the instant offense. (*Id.*). His parole or supervision was revoked in 1994, 1995, 1997, twice in 1999, 2000, twice in 2001, 2006, 2010, and 2017. (*Id.*).

On August 26, 2019, the Court sentenced defendant. (Doc. 74). Defendant was in criminal history category VI with a total offense level of 36, yielding an advisory guideline range of imprisonment of 324 to 405 months followed by at least five years on supervised release. (Doc. 64, at 24–25). The Court granted defendant's request for a downward variance (Doc. 67) and sentenced him to 323 months' and 25 days imprisonment followed by five years on supervised release (Doc. 76). On August 28, 2019, defendant timely appealed his sentence. (Doc. 78). On July 9, 2020, the Eighth Circuit Court of Appeals affirmed defendant's sentence. (Doc. 90).

4

On July 28, 2020, defendant filed a pro se motion for compassionate release. (Doc. 91). Defendant later filed a supplement to his motion with the assistance of counsel. (Doc. 93). On October 9, 2020, defendant, with counsel, filed his Amended Motion for Compassionate Release now before the Court. (Doc. 99). Defendant is currently incarcerated at Lompoc USP with a projected release date of June 16, 2041.[1]

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

---

[1] *Find an Inmate*, BOP, https://www.bop.gov/inmateloc/.

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the United States Sentencing Guidelines ("USSG") section discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded that USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).[2]

---

[2] The Court need not rehash the parties' arguments on this issue given its consistent position.

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

Section 3582(c)(1)(A) states a court may reduce a term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has held that defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

On May 27, 2020, defendant submitted a request for release to his warden. (Doc. 91, at 7–8). On June 26, 2020, the warden denied defendant's request. (*Id.*, at 9).

The government argues defendant's request is insufficient because it did not mention the COVID-19 pandemic or defendant's hypertension. (Doc. 102, at 12). Although defendant did not explicitly cite the pandemic, he cited the Coronavirus Aid, Relief, and Economic Security ("CARES") Act which suggests his request related to the pandemic. *See* (Doc. 91, at 2). Even if defendant had failed to refer to the pandemic entirely, this Court has consistently held that a defendant's request need not mention the pandemic so long as the BOP denied the request at a time which necessarily entailed consideration of the pandemic. *See, e.g.*, *United States v. Polk*, No. 13-CR-2011 CJW-MAR, 2020 WL 4207550, at *4 (N.D. Iowa July 22, 2020). Here, because defendant's request was denied in June 2020, the BOP had the opportunity to consider defendant's health conditions in light of the pandemic. Thus, this deficiency is immaterial.

Defendant's failure to cite his hypertension in his request to the BOP also does not preclude exhaustion of administrative remedies. The BOP acknowledged that defendant's request for release was "based on [his] health." (Doc. 91, at 9). Although the BOP confined its review to whether defendant was "terminal or debilitated" under the policy,

it also stated that defendant's medical documentation was "carefully reviewed and considered." (*Id.*). Defendant's hypertension is discussed on nearly every substantive page of his medical records. *See generally* (Doc. 99-3). Thus, as a matter of practicality, it is simply not realistic that the BOP overlooked this condition such that its review of defendant's health was deficient. Rather, the BOP knew that defendant's request was health-based and had the opportunity to review his records and easily discover his hypertension, whether defendant mentioned it or not.

The Court is aware that an inmate is required to, at a minimum, state the "extraordinary or compelling circumstances that the inmate believes warrant consideration" in their request for release. *See* 28 C.F.R. § 571.61. Section 1B1.13, however, lists circumstances warranting release other than a defendant's medical conditions, such as the age of the defendant and family circumstances. The regulatory scheme speaks generally about these grounds for release, not specifically. In other words, it is sufficient for a defendant to alert the BOP of the general grounds they assert for relief so long as the BOP has the information necessary to investigate such grounds. For example, if a defendant cites their health and the BOP affirms that it has reviewed the defendant's medical records, the defendant has exhausted their health-related grounds for release regardless of whether they list out every potentially relevant condition. Although other courts disagree, *see, e.g.*, *United States v. Douglas*, No. 10-171-4 (JDB), 2020 WL 5816244, at *2 (D.D.C. Sept. 30, 2020), *United States v. Alderson*, No. 18-20348, 2020 WL 4696599, at *2 (E.D. Mich. Aug. 13, 2020), the Court finds that the administrative exhaustion process is not circumvented under these circumstances, but rather, better served. Considering the general grounds cited by defendants comports with how the BOP reviews such requests and better facilitates the compassionate release process rather than harping on bureaucratic specificities.

Because 30 days have elapsed since defendant submitted his request to the warden, the Court finds he has fulfilled the exhaustion requirement of Section 3582(c)(1)(A).[3]

## B. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his age of 46, hypertension, high cholesterol, "coronary obesity," sleep apnea, and spinal surgery complications put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 99, at 18). Currently, Lompoc USP has no active cases of COVID-19 among its inmate population, although 148 inmates have recovered, and two inmates have died.[4] There are four active COVID-19 cases among the staff, 24 staff members have recovered, and no staff members have died. *Id.*

The presence of COVID-19 at a defendant's specific facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases).[5] The Centers for Disease Control and Prevention ("CDC") recognizes that obesity, i.e. a body mass index ("BMI") in excess of 30, and heart disease are risk factors relevant to COVID-19.[6] High blood pressure may also be a risk factor. *Id.* Although chronic lung

---

[3] The Court also notes that defendant raised a litany of other conditions in his initial request to the BOP and in his pro se motion. (Docs. 91 & 93). Because defendant does not reiterate those conditions here, the Court will not consider them.

[4] *COVID-19*, BOP, https://www.bop.gov/coronavirus/.

[5] *See also People at Increased Risk*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html.

[6] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/-coronavirus/2019-ncov/need-extra-precautions-/people-with-medical-conditions.html?-CDC_AA_refVal-

9

diseases are a risk factor, the CDC does not list sleep apnea as an actual or potential risk. *Id.* The CDC also does not list high cholesterol, hyperlipidemia, or surgical complications as actual or potential risk factors. *Id.* A person's susceptibility to COVID-19 also increases with their age.[7] Eight out of ten deaths related to COVID-19 in the United States have been in adults older than 65. *Id.* Persons over age 85 are at "[t]he greatest risk for severe illness from COVID-19." *Id.*

Defendant is 46 years old. (Doc. 64, at 2). Thus, although the Court notes his age, he is not in or near a high-risk category.

Defendant argues he experiences "ongoing complications related to his spinal surgery in August 2019." (Doc. 99, at 18). His surgery addressed a herniated nucleus pulposus, which can cause back and neck pain. (Doc. 72-1).[8] Defendant never lists his alleged complications but does state that he has "had issues with mobility and pain and/or numbness in his extremities due to the hernia." (Doc. 99, at 2). Defendant does not cite specific parts of the record, instead generally citing three exhibits totaling 117 pages. (*Id.*, at 18) (citing (Docs. 99-1, 99-2, & 99-3)). Based on the Court's review of these exhibits, numbness in defendant's left arm is noted once and defendant's "episodic" and "minor" neck pain is occasionally noted. (Doc. 99-3, at 64, 70, 72, 101). Defendant's chronic headaches are also noted as starting "at [the] back of [his] head," but these are often attributed to his hypertension, as is his neck pain. (Doc. 99-3, at 34, 70). In any

---

=https%3A%2F-%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2F-groups-at-higher-risk.html.

[7] *Older Adults*, CDC, https://www.cdc.gov/-coronavirus/2019-ncov/need-extra-precautions/-older-adults.html.

[8]*Herniated Nucleus Pulposus*, MedlinePlus, https://medlineplus.gov/ency/imagepages/9700.htm#:~:text=Herniated%20nucleus%20pulposus%20is%20a,pain%20and%20nerve%20root%20irritation.

event, defendant fails to explain how these alleged complications raise his susceptibility to COVID-19. Thus, the Court affords this condition little weight.[9]

Defendant concedes that he "does not yet have identified heart disease," but seems to suggest that he may soon have heart disease. (Doc. 99, at 18). The Court declines to consider health conditions defendant speculates he may have or might develop.

Although defendant mentions his sleep apnea, he does not describe how it raises his susceptibility to COVID-19. (Doc. 99, at 18). It is not a recognized risk factor. There is no mention in the record that defendant uses a CPAP machine or that his sleep apnea is particularly obstructive or significant. Thus, the Court affords this condition little weight.

Defendant does not discuss his weight in detail. (*Id.*). His weight is noted as 330 lbs. on October 6, 2020. (Doc. 99-3, at 2). Given his height of 6' 2'' (Doc. 64, at 2), his BMI is 42.4, which is well above the CDC's risk category for persons with a BMI in excess of 30. This is a 50 pound increase from defendant's weight in just over a year. *See* (Doc. 64, at 2). Thus, the Court affords this factor significant weight and finds that defendant's obesity does increase his susceptibility to COVID-19.

Although defendant mentions his high cholesterol, he provides no argument as to this condition other than that it exacerbates his obesity. (Doc. 99, at 3, 18); *see also* (Doc. 99-1) (noting defendant's cholesterol). Because the CDC does not recognize it as a risk factor, the Court has generally given high cholesterol little to no weight in its analysis. *See, e.g.*, *United States v. Wilson*, No. 13-CR-2011 CJW-MAR, 2020 WL 5894193, at *4 (N.D. Iowa October 5, 2020). Thus, although the Court will consider

---

[9] The Court is aware of, as defendant mentions here, defendant's civil lawsuit filed in this Court related to his alleged neck injury. (Doc. 99, at 2); *see also* (*Clutts v. Washington*, 1:20-cv-00080-CJW-KEM (N.D. Iowa) (Doc. 1)). The Court bases its finding here on the exhibits provided in this case, not defendant's allegations in his civil lawsuit. The Court makes no finding about the merits of defendant's civil lawsuit here.

11

this condition in tandem with defendant's obesity, it notes that high cholesterol is not known to actually or potentially increase a person's susceptibility to COVID-19.

The record shows that defendant has severe and consistent hypertension, often requiring hospitalization. *See, e.g.*, (Doc. 99-3, at 2, 35, 51). Despite taking multiple medications, defendant's hypertension is still considered uncontrolled. (*Id.*, at 7, 9, 10, 28) ("Blood Pressure remains uncontrolled with medications."). His blood pressure readings often place him in hypertensive crisis. (*Id.*, at 9, 13, 34).[10] Defendant regularly suffers from, among other things, severe headaches, tinnitus, swelling in his legs, and "bouncing" vision as a result of his hypertension. (Doc. 99-3, at 20, 24, 30, 31, 63, 64, 79). Although the CDC only considers hypertension to be a potential risk factor, the Court finds that defendant's hypertension is sufficiently severe such that it should be considered a risk factor here.

On balance, the Court finds defendant has presented an extraordinary and compelling reason for release, albeit marginally. Defendant's obesity is severe with a BMI far exceeding the risk threshold. Although defendant has received more than adequate medical care while in the BOP, his hypertension remains urgent and uncontrolled. These risks are further bolstered, to some extent, by defendant's high cholesterol and other medical conditions cited. Thus, although defendant's needs are being thoroughly addressed by BOP medical staff, his persisting conditions place him at a significantly elevated risk of complications should he contract COVID-19. *See, e.g.*, *United States v. Johnson*, No. 03-20013-01-JWL, 2020 WL 5993291, at *2 (D. Kan. Oct. 9, 2020) (finding extraordinary and compelling circumstances where the defendant's BMI was 46.6 and the defendant suffered from obstructive sleep apnea requiring the use

---

[10] *See also Understanding Blood Pressure Readings*, American Heart Association, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings.

of a CPAP machine and had prediabetes); *United States v. Anello*, No. 2:12-cr-00131-RAJ, 2020 WL 3971399, at *1, *6 (W.D. Wash. July 14, 2020) (finding extraordinary and compelling circumstances, in part, due to the defendant's BMI of approximately 35 and his uncontrolled hypertension).

Although there are no active cases among the inmate population at defendant's facility at this time, the Court has, unfortunately, seen how quickly that can change. This Court has both commended the BOP's efforts to stymie the virus while, at the same time, recognized that the conditions of incarceration inherently create a greater risk of transmission. *United States v. Tillman*, No. 12-CR-2024-CJW-MAR, 2020 WL 3578374, at *5 (N.D. Iowa June 30, 2020). Given that there is a significant likelihood that cases will again rise at the facility, the Court finds that defendant's conditions present a marginal reason for release despite the current absence of active cases.

### C. *Section 3553(a) Factors and Danger to Community*

Defendant argues the Section 3553(a) factors favor release. (Doc. 99, at 22–24). The Court disagrees. Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

The 3553(a) factors overwhelmingly weigh against release. The Court is sympathetic to defendant's current medical issues, his troubled childhood, and his struggles with substance abuse. These issues, however, do not warrant a reduction in defendant's sentence in excess of 90%. (Docs. 99, at 23; 102, at 21). Defendant was sentenced a little over a year ago. His projected release date is more than 20 years away. Indeed, based on the nature and circumstances of the offense and defendant's history and characteristics, this sentence is appropriate. Defendant was involved in the interstate trafficking of controlled substances. He possessed firearms in furtherance of his drug trafficking. Despite being pulled over by officers multiple times and consistently found to be in possession of multiple controlled substances, distribution supplies, and cash, defendant was not deterred and continued to traffic in drugs. When his co-conspirator was arrested, defendant attempted to continue the trafficking operation by enlisting his co-conspirator's minor teenage son.

This is not merely an offense where defendant sold narcotics to support his own addiction. Defendant had not held formal employment in at least ten years, suggesting he supported himself by trafficking drugs. His criminal history has spanned his entire adult life and his performance on parole or supervision has been abysmal. His history includes multiple convictions related to firearms and possession of controlled substances and one prior conviction for possession with intent to distribute a controlled substance. Further, during his instant term of incarceration, defendant has already incurred a disciplinary violation for failure to follow an order. (Doc. 102-3).

In short, the aggravating factors here warranted the sentence the Court rendered. Dramatically reducing defendant's sentence would fail to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and would cause defendant's sentence to be disparate from similarly situated defendants. Defendant has also not completed drug treatment (Doc. 102-2) and, thus, defendant's continued

14

incarceration also provides him with further rehabilitative opportunities.  Further, defendant's recidivist criminal history shows that prior terms of incarceration have not deterred him and that he still presents a danger to the community if released.

Defendant's medical conditions are not so concerning that they warrant release in light of these factors.  Defendant argues that the Court "did not sentence [him] to death." (Doc. 99, at 23).  Indeed, the Court did not sentence defendant to death in August 2019 and it does not do so now.  Rather, the Court balances the risks posed by defendant's relevant health conditions amid the pandemic with the traditional 3553(a) factors as called for by the standards of compassionate release.  Although some of defendant's health conditions remain uncontrolled, he is receiving attentive and adequate medical care through the BOP.  Admittedly, the conditions of incarceration somewhat increase the likelihood that defendant will contract COVID-19.  This possibility, however, would not simply evaporate if defendant was released.  Thus, the Court must consider the likelihood that defendant will contract COVID-19 and the corresponding likelihood that he will suffer complications from the disease in light of his health conditions along with the general principles of sentencing.  On balance, the marginal potential risk created by defendant's continued incarceration does not outweigh the benefits of defendant's

15

Case 1:18-cr-00070-CJW-MAR   Document 103   Filed 11/05/20   Page 15 of 16

sentence for the reasons discussed above.[11]  This is true even in light of defendant's release plan and proposed service of home confinement.[12]

## V. CONCLUSION

For these reasons, defendant's Amended Motion for Compassionate Release (Doc. 99) is **denied**.[13]  Defendant must serve the remainder of his term of imprisonment as previously directed.  (Doc. 76).

**IT IS SO ORDERED** this 5th day of November, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

---

[11] Defendant notes that being incarcerated during the COVID-19 pandemic could constitute cruel and unusual punishment.  (Doc. 99, at 24).  Although the Court declines to parse the merits of a potential Eighth Amendment claim by defendant, the Court finds that the existence of the pandemic alone does not cause a person's incarceration to become cruel and unusual.  Rather, a prison official must exhibit deliberate indifference towards an inmate's serious medical needs. *See, e.g.*, *Brown v. Mitchell*, 327 F. Supp. 2d 615, 656 (E.D. Va. 2004).  The BOP has taken extraordinary measures to combat COVID-19 in its facilities.  The mere fact that a person becomes ill while incarcerated is insufficient.  The Court has no reason, at this time, to believe anyone in the BOP has been deliberately indifferent to any of defendant's serious medical needs.

[12] Defendant's proposals that the Court convert his remaining term of imprisonment to supervised release or a term of home confinement are simply not realistic in light of the time remaining on defendant's term of incarceration.  Even if the time remaining could feasibly be served on home confinement, the Court still finds release inappropriate for the reasons discussed above.

[13] To the extent defendant's pro se Motion for Compassionate Release (Docs. 91 & 93) is not superseded by his amended motion, the Court **denies** it as duplicative.